OPINION
{¶ 1} Marcus D. White, defendant-appellant, appeals from a judgment of the Franklin County Court of Common Pleas, in which the court sentenced him to a term of incarceration, pursuant to a jury verdict finding him guilty of murder, in violation of R.C.2903.02, an unspecified felony; and felonious assault, in violation of R.C. 2903.11, a second-degree felony.
 {¶ 2} Appellant and Tamica Spraggins met in 2001, and began dating. Appellant entered the military in March 2002, and Tamica discovered she was pregnant at approximately the same time. Tamica delivered a baby girl on October 14, 2002, and Tamica and appellant married on February 1, 2003. The relationship between appellant and Tamica was unstable, and, after he returned from military service in March 2003, the two never formally resided together, although they stayed with each other for various periods in both Columbus and Cincinnati. However, in September 2003, appellant told Tamica he was moving into her residence in Columbus, which she shared with their daughter; Tamica's daughter from a prior relationship; Tamica's mother, Debra Green; and Tamica's 16-year-old brother, Bradford Spraggins.
 {¶ 3} On Sunday, October 12, 2003, Tamica told appellant to come to her house and remove his belongings from the residence. Appellant had their daughter with him that day, and, when he arrived at Tamica's home that evening, he brought their daughter, his friend, George Price, and George's son and daughter. While appellant was removing his personal items from the residence, appellant and Tamica began to argue, largely over a small box of photographs and other papers. After George took the box and put it in the trunk of appellant's vehicle, Tamica eventually regained control of it and hid it behind some apartments, but appellant retrieved it. An argument between appellant and Tamica over the box continued until Bradford arrived at the scene with a friend, DeAngelo Hall, at which point Bradford and appellant began to argue. At some point, Bradford told DeAngelo to get DeAngelo's gun. Debra eventually intervened, pushing Bradford away.
 {¶ 4} Appellant retrieved a handgun from the trunk of his car and fired two shots into the air. Appellant testified at trial that George then attempted to remove him from the situation and grabbed his arm. Appellant claimed he pulled his arm away, at which point another shot was inadvertently fired, striking Tamica in the face. After Tamica fell to the ground, Debra, who was carrying her cell phone in her hand, ran to aid Tamica. Appellant claimed at trial he saw an unidentifiable person running toward him with a silver object he believed was a gun, so he fired his own gun. The bullet struck Debra in the face, and she died from her injuries, although Tamica survived. Appellant fled the scene in his automobile and went to his mother's house, where he eventually called 911 and was subsequently arrested.
 {¶ 5} Appellant was indicted on October 22, 2003, for aggravated murder with capital and firearm specifications with regard to the death of Debra; attempted murder with a firearm specification with regard to Tamica; and tampering with evidence. A jury trial commenced on May 20, 2005, during which the state dismissed the tampering with evidence count. The jury returned a verdict finding appellant not guilty of aggravated murder, but guilty of the lesser-included offense of murder; and not guilty of attempted murder, but guilty of the lesser-included offense of felonious assault. The jury also found appellant had a firearm while committing the offenses and used the firearm to facilitate the offenses. After a sentencing hearing on August 2, 2005, the trial court sentenced appellant to 15 years to life on the murder charge and seven years on the felonious assault charge, with the sentences to be served consecutively. The court also sentenced appellant to three years of incarceration for both firearm specifications. Appellant appeals the judgment of the trial court, asserting the following four assignments of error:
[I.] THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT FOR MURDER (AS A PROXIMATE RESULT OF FELONIOUS ASSAULT) WHEN THE MANIFEST WEIGHT OF THE EVIDENCE PROVED BY A PREPONDERANCE OF THE EVIDENCE THAT DEFENDANT-APPELLANT ACTED IN SELF-DEFENSE IN USING DEADLY FORCE AGAINST ANOTHER.
[II.] THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT FOR FELONIOUS ASSAULT AS TO COUNT TWO OF THE INDICTMENT WHEN THE MANIFEST WEIGHT OF THE EVIDENCE PROVED THAT APPELLANT ACCIDENTALLY SHOT AND INJURED ANOTHER BY MEANS OF A DEADLY WEAPON. [III.] THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN INSTRUCTING THE JURY ON THE ISSUE OF SELF-DEFENSE.
[IV.] THE TRIAL COURT ERRED IN IMPOSING A NON-MINIMUM PRISON TERM FOR FOR [sic] FELONIOUS ASSAULT, A FELONY OF THE SECOND DEGREE, AND IN ORDERING SAID SENTENCE TO BE SERVED CONSECUTIVELY TO THE SENTENCE IMPOSED FOR MURDER, WHEN THE ADDITIONAL FINDINGS NECESSARY TO IMPOSE A GREATER THAN MINIMUM SENTENCE AND CONSECUTIVE SENTENCES WERE NOT PROVED TO THE JURY BEYOND A REASONABLE DOUBT, IN VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.
 {¶ 6} Appellant argues in his first assignment of error that the jury's verdict was erroneous because the manifest weight of the evidence proved that he acted in self-defense in using deadly force against Debra. Our function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. State v. Thompkins
(1997), 78 Ohio St.3d 380, 387. In order to undertake this review, we must sit as a "thirteenth juror" and review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. Id., citing State v. Martin (1983),20 Ohio App.3d 172, 175. If we find that the factfinder clearly lost its way, we must reverse the conviction and order a new trial. Id. On the other hand, we will not reverse a conviction so long as the state presented substantial evidence for a reasonable trier of fact to conclude that all of the essential elements of the offense were established beyond a reasonable doubt. State v.Getsy (1998), 84 Ohio St.3d 180, 193-194; State v. Eley
(1978), 56 Ohio St.2d 169, syllabus. In conducting our review, we are guided by the presumption that the jury "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Seasons Coal Co. v.Cleveland (1984), 10 Ohio St.3d 77, 80.
 {¶ 7} Self-defense is an affirmative defense within the meaning of R.C. 2901.05(C)(2). A defendant, therefore, has the burden of proving self-defense by a preponderance of the evidence. R.C. 2901.05(A). To establish a self-defense claim, the accused must prove: (1) the accused was not at fault in creating the situation giving rise to the affray; (2) the accused has a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) the accused must not have violated any duty to retreat or avoid the danger. State v.Robbins (1979), 58 Ohio St.2d 74, paragraph two of the syllabus. Thus, an individual who is without fault may defend himself by using either deadly or non-deadly force. Akron v. Dokes (1986),31 Ohio App.3d 24, 25. The degree of force permitted depends upon what is reasonably necessary to protect that individual from the imminent use of unlawful force. Id.
 {¶ 8} Here, appellant maintains the weight of the evidence established the elements to a self-defense claim. The relevant testimony was as follows. Tamica testified that, in October 2003, she and appellant were not on good terms. Appellant had had confrontations with her, her mother, and her brother, and had threatened to use his gun on those occasions. He also stated to her and her mother during several disagreements "pow, pow, pow," as if shooting them. On October 12, 2003, after getting into an argument with appellant on the phone and telling him to come get his belongings, Tamica packed appellant's effects into a suitcase. Appellant arrived at the residence with George Price and his children, at which point appellant retrieved his suitcase and took it back upstairs. Tamica heard a pounding from upstairs, and, when she walked upstairs, appellant was flipping over the bed and throwing clothes and photographs out of the closet. Tamica testified that, when he picked up a box that contained important records, she told him to give her the box. Appellant took the box and locked it inside his car. While appellant was rooting through more items in the house, Tamica convinced George to give her the box from the car, which she hid behind her neighbor's apartment. Appellant became angry that George had given her the box, so he went outside and found it, and Tamica tried to get it back and pull items from the box as he carried it to his car. Witnessing the tussle, Bradford came to the scene and told appellant to stop pushing Tamica and followed the two to the car. Not wanting Bradford to get involved, Debra came out of the house carrying her cell phone and demanded Bradford go into the house. Debra then followed the group to the car. A struggle for the box ensued between Tamica and appellant as appellant was trying to put it into his trunk. Tamica stated that appellant then let go of the box and removed a gun from the trunk.
 {¶ 9} Tamica testified that everyone scattered at that point, and appellant fired the gun into the air twice, stating: "Who wants some?" after the first shot, and "I will kill everybody out here" after the second shot. Tamica stated she heard her brother yell something to his friend, and, when she turned around, appellant shot her in the face from about seven feet away. Her mother then began screaming. From the ground, Tamica looked up and saw appellant walking toward her mother. As her mother turned, appellant extended the gun fully in front of him and shot Debra from about five feet away.
 {¶ 10} On cross-examination, Tamica stated appellant wore glasses sometimes. Tamica also stated Bradford yelled something to his friend about getting a gun after appellant had pulled out his gun. She also stated that, after appellant retrieved the gun from the trunk, she retreated to the street curb and did not say anything else before she was shot. Tamica further testified that, after she was shot, her mother came toward her screaming, which was also in appellant's direction, and she was holding a cell phone.
 {¶ 11} Tamica also stated that, during an argument about ending their marriage before the shooting, appellant told her if he did not have her in life, he would have her in death. She also stated appellant drove "plenty of times" without his glasses. Tamica stated that it was 7:30 p.m. at the time of the incident, and the cell phone in her mother's hand lit up, which was how she identified it as a cell phone.
 {¶ 12} The first responder to the scene, Columbus Police Officer Brett Laird, testified that it was dark when he arrived at the scene, and the street was lined with large trees. Del Shepherd, a city of Whitehall firefighter, testified that, when he was rendering aid to Tamica at the scene, she told him her husband shot her and then walked around the car and shot her mother.
 {¶ 13} Jacqueline Elmarhoumy, Tamica's neighbor, testified that, on the night of the incident, she heard arguing and a gunshot. She walked to her front door and heard another shot and a scream. She looked out her door and saw appellant standing in the street near a car, and then he walked further down the street. She left to dial 911 and heard another scream and gunshot. She testified she then saw appellant walking down the street away from her, at which time she heard more screams and another gunshot. Appellant "casually" walked back in the direction of her apartment, got into the car, and drove away. She stated appellant was no more than five feet away from Debra when he shot her.
 {¶ 14} Patrick Fardal, who worked for the Franklin County Coroner's Office, testified there was no powder residue on Debra's face, indicating that the distance of the gun to her would have been greater than two to three feet away. Beyond that distance, he could not determine how far the gun had been away from Debra.
 {¶ 15} Bradford testified that, early Saturday morning before the incident in question, he and appellant got into an argument after Bradford came home late with some friends. He stated that, on the Sunday evening of the incident, he and his friend, DeAngelo, were knocking on a neighbor's door, when they heard arguing coming from Bradford's home. They went to the home and saw George taking a box out of the apartment, which was very messy. Tamica and appellant followed George out to the street, and Bradford and DeAngelo followed them. Bradford saw Tamica trying to take the box from George, so Bradford started grabbing for the box, too. Bradford stated he never saw Tamica hit appellant while she was trying to retrieve the box. As they struggled for the box, Debra came outside with a cell phone in her hand. Bradford testified that Debra pushed him from the affray, and he told DeAngelo to go get DeAngelo's gun, which was at his house down the street. After Debra pushed him 15 feet away and off the street, he heard a gunshot. When he turned, he saw his sister on the ground. He stated his mother then began to scream, "my baby." He watched his mother rush "sort of fast" toward Tamica, but then move back quickly after she got within about eight feet of her. Bradford testified he looked over at Tamica for a moment, and, when he looked back at his mother, appellant had extended his gun up to her face and shot her from about three feet away. The two shootings took place within about ten seconds. He stated no one was even running toward appellant or threatening him. After shooting Debra, appellant looked at Bradford and smiled. He remembered only two shots being fired. Bradford also admitted he was arrested for riding in a stolen car when he was a juvenile, but his record had been expunged.
 {¶ 16} LaTanya Speed-McGrew testified on behalf of appellant and is his aunt. She stated on the day of the incident she and appellant spoke three times on the phone about her writing a letter for him with regard to his child support payments. She stated he did not sound upset or distraught, and he never told her that Tamica was forcing him to leave the house that evening. She admitted she had three convictions for passing bad checks.
 {¶ 17} George Price, who was married to appellant's mother for 27 years, testified that he was convicted of robbery in 1986, and rape and theft in 1990. He was released from prison after 13 and one-half years on July 21, 2003. He testified that, on the evening of the incident, he did not go to Tamica's house with appellant expecting any trouble. He insisted they were going there only to drop off appellant and Tamica's baby. On the way, appellant did not seem upset or distraught. After they arrived at Tamica's house, he heard Tamica and appellant arguing upstairs. When he went upstairs, he saw Tamica pulling and hitting appellant. He told appellant to get his things and leave, and George made a few trips back and forth from the car with appellant's personal items. George then took a small box to the car. Tamica followed him, telling him that she had papers in the box and trying to pull the papers from it. Because he was on parole at the time, when Tamica stated she was going to call the police, he retrieved the box from the trunk of the car and gave it to her. He watched her take the box and hide it behind another apartment. When appellant asked him where the box was, George told him, and appellant retrieved it. Tamica then ran to appellant and began trying to grab the box. While appellant was trying to put the box in the trunk of the car, Bradford and his friend came toward them from the walkway. Bradford "nudged" appellant and told him to give the box back to his sister.
 {¶ 18} George testified that appellant then yelled for everyone to back away from the car, at which point Bradford told a man on a bike to go get a gun. Tamica was yelling at appellant, and then he saw appellant fire two shots in the air from a gun. George told appellant to get in the car, and attempted to physically push him toward the car. George testified that, after he pushed him, the gun fired, and he saw Tamica hit the ground. Tamica then stood up and ran toward George, and he moved out of the way. George then heard another shot, and he saw Debra lying on the ground. He stated the two shots happened right after the other. George then told appellant to get in the car and leave. George stated that Bradford was by the trunk of the car as the events were unfolding. George later stated Debra was coming toward appellant when he shot her from five to seven feet away, and Tamica was ten feet away from appellant.
 {¶ 19} George admitted that, after the incident in question, he was convicted of domestic violence and sent back to prison. He did not remember telling police a completely different version of the events than what he testified to at trial. He did not remember he told the police that he and appellant were going to Tamica's apartment because she told him their relationship was over and he needed to come get his things. He also did not remember telling police that he first saw appellant's gun in his pants in the house, and describing to police the movement appellant made to get the gun out. He denied that, when he saw appellant grab for the gun, he ran away by the other apartments. He stated he was beside appellant for the entire incident. He admitted that he was leaving the scene when the police arrived. George stated he did not remember telling the police that appellant was calm after he shot Tamica and Debra. He also insisted that he was at the trunk of the car when the shots occurred, and he denied that he told the police that he, his son, and his daughter were inside the house, just walking out, when the first shot was fired.
 {¶ 20} However, on redirect examination, after George was given an opportunity to review his videotaped statement made to police after the incident, George admitted that, at the time he spoke with the police, he was concerned about being on parole and how it would look if he had been nearby when the incident happened. He admitted that, although he told police that he was in the house at the time appellant and Tamica were by the car pushing and shoving over the box, he was actually by the car. He stated he was not in the house at the time of the shootings, as he told the police. He also admitted that, after the shootings and after he told appellant to get in the car and leave, he ran away. He stated he was sure that Bradford directed the man on the bike to get a gun.
 {¶ 21} Appellant testified that Bradford was in a gang, the Bloods. He stated he and Bradford got into an argument on the Saturday morning before the incident, when Bradford came to the house with two friends, one of which he stated was a gang member, and they were being loud. He stated Bradford threatened to kill him. Appellant testified that he expected no trouble when he returned to the house on Sunday, except he was uncomfortable because of the incident with Bradford on Saturday morning. He had decided he was going to pack his things in the house and take them with him. When he went into the upstairs closet, he saw the small box and decided he wanted some of the papers in it because they could help him during a divorce, so he took it down to his car and put it inside the trunk. After packing more items in the upstairs bedroom, he gave a suitcase to George to put in the car. When George returned to the bedroom, appellant discovered that George had given the box to Tamica. Appellant understood that George did not want the police to get involved because he was on parole and a sexual predator who was not supposed to leave Hamilton County. Appellant testified that, after he argued with George, George got the box, and they took it to the trunk with Tamica trying to grab it. At this time, he saw Bradford coming down the street with DeAngelo, and Debra coming out of the apartment. As he and George were trying to put the box in the trunk, he, Tamica, George, and Bradford wrestled for the box. At this point, Bradford stated: "Go get that shit, go get the gun, I'm going to kill this nigger." Debra then pulled Bradford away, while Tamica continued to struggle for the box, eventually slapping appellant in the face. He stated that, instead of leaving, DeAngelo started coming toward him, and he did not know if he had a gun or knife on him.
 {¶ 22} Appellant testified that he then grabbed the gun from the trunk and shot two shots in the air. Bradford then yelled to DeAngelo to get the gun, and DeAngelo ran away. George tried to get him into the car and grabbed his arm. Appellant stated that, as he snatched his arm away, the gun discharged. He stated he was not trying to shoot anyone, but the bullet hit Tamica. For four or five seconds, he stood in one place and then moved back one or two cars. As he was watching Bradford tend to his sister, he looked up and saw someone rushing toward him with something silver in her hand. He stated he wears glasses and it was dark, so he could not focus on the identity of the person. He raised his gun and fired it, believing he was in danger. Bradford then stated he was going to kill him and ran away, so appellant got into his car and drove to his mother's house.
 {¶ 23} Appellant stated that he did not rush to the aid of his wife because she covered her face with her hands and he initially did not know whether he had shot her. He also stated he was not sure if there was another firearm involved because Debra's cell phone was never inventoried by the police, so it may have actually been a gun he saw. Appellant also later admitted Tamica had called him to come get his belongings, so that was why he was going to her house, along with having to drop off their baby. Appellant also stated that, although he testified at trial to a lot of details about the shooting, when he was interviewed by police four hours after the incident, he was unable to explain because he was scared and nervous. He stated when he went to his mother's house, he did not know whom he had shot because he was so upset.
 {¶ 24} Adette Gordon, appellant's mother, testified that, earlier in the day, appellant had been laughing and playing with his baby at her home. He called Tamica and told her he was going to drop off the baby, but Tamica did not want him to do that because she had things she needed to do. Tamica also told him to come get his clothes out of the house. Gordon testified that appellant came back to her house after the incident, and he was very upset and crying. He kept trying to go upstairs, and, when she confronted him, he told her he wanted to die and he did not want to go to jail. He told her he thought he had shot Tamica and her mother and that he thought they were dead, although he was not sure. Appellant told her that everyone at the scene kept "coming up on him." She admitted that she had been convicted of passing bad checks on two occasions and had a prior theft conviction.
 {¶ 25} After reviewing the entire record, weighing the evidence and all reasonable inferences, we cannot conclude the jury's failure to find appellant acted in self-defense was against the manifest weight of the evidence. Each of the witnesses gave differing accounts of the actions leading up to the shootings, and even the testimony of the state's witnesses differed on important facts. Thus, which witnesses were more credible was a key factor in making a self-defense determination. Appellant has failed to give this court any reason to question the jury's apparent belief that appellant did not act in self-defense. There was substantial evidence that the jury could have believed to conclude appellant did not act in self-defense. Tamica testified when she tried to retrieve the small box from appellant's trunk, a struggle for the box took place, until appellant finally retrieved a gun from the trunk. She stated everyone ran away from appellant at that point; yet he still fired two shots into the air and told everyone he would kill them. Tamica stated that, after she was shot, she saw appellant walking toward her mother, and he extended his gun fully and shot her mother from about five feet away as her mother turned around. Elmarhoumy corroborated Tamica's version, stating that appellant was walking toward Debra when he shot her from five feet away. Bradford also stated that Debra was backing away from appellant when she was shot, and at no time did Debra run toward appellant.
 {¶ 26} Although appellant testified that he shot Debra because he was scared when he saw an unidentifiable person rushing toward him with something silver in her hand, the only support for this version of the facts comes from George, whose entire testimony could have been reasonably discounted by the jury due to the inconsistency between the statements he gave to the police and his testimony at trial. Even when questioned at trial about the statements George made to police, George steadfastly denied making them until he later recanted after viewing his videotaped interview with police. The jury apparently did not believe George, with reasonable justification. See Statev. Baker, 159 Ohio App.3d 462, 2005-Ohio-45, at ¶ 20 (statements to the police that were inconsistent with witness's testimony at trial supported inference that testimony was untruthful). Also, appellant's claim that he was without his glasses that night and it was too dark to identify Debra or the cell phone is unpersuasive, given he apparently had the ability to accurately identify all of the other persons and objects involved and give testimony as to what the other persons' actions were during the incident. Tamica also stated that appellant wore glasses only sometimes, and he drove without them "plenty" of times. She also testified that her mother's cell phone lit up, making it identifiable as such. It is also important to note that appellant never alleged that Debra was pointing the cell phone at him or making any other gesture with the cell phone to persuade him that it was a weapon. Other circumstances also refute a self-defense claim, including that appellant shot both Tamica and her mother at close range, and he struck them in the same part of the body, the face, suggesting purposeful aim.
 {¶ 27} Thus, the weight of the evidence supports that appellant was at fault in creating the situation giving rise to the affray. Appellant was the only person to retrieve and possess a gun and fire it. No other person brandished or possessed a gun. Because Bradford had to tell DeAngelo to go get a gun, it had to be apparent to appellant that neither Bradford nor DeAngelo had one at the time. Also, that appellant fired two shots into the air and threatened to kill everyone, yet no other person displayed a gun or shot back in response, is significant to demonstrate that appellant had to know no one else at the scene possessed a gun. Thus, it was appellant's voluntary retrieval of the gun that was responsible for escalating the circumstances beyond pushing and yelling. Further, appellant's belief that he was in danger of death or great bodily harm at the time he shot Debra was not credible, as explained above. In addition, because it was not credible that appellant believed he was under attack by Debra or any other person, he could have retreated and removed himself from the situation without shooting Debra. For these reasons, we find the weight of the evidence does not demonstrate that appellant acted in self-defense, and the jury did not err in failing to find so. Therefore, appellant's first assignment of error is overruled.
 {¶ 28} Appellant argues in his second assignment of error that the jury's verdict was erroneous because the manifest weight of the evidence proved that he accidentally shot and injured Tamica by means of a deadly weapon. An accident is that which is unintentional and unwilled and implies a lack of criminal culpability. State v. Ross (1999), 135 Ohio App.3d 262. The defense of accident is not an affirmative defense but is tantamount to a denial that an unlawful act was committed; it is not a justification for a defendant's admitted conduct. Jones v.State (1894), 51 Ohio St. 331, 342. By raising the defense of accident, defendant denies that the act was intentional or purposeful. State v. Fears (1999), 86 Ohio St.3d 329.
 {¶ 29} R.C. 2903.11, felonious assault, provides, in pertinent part:
(A) No person shall knowingly do either of the following: * * *
(2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance.
 {¶ 30} In the present case, what appellant essentially asserts is that the jury's determination that his shooting of Tamica was done "knowingly" was against the manifest weight of the evidence. We disagree. Appellant argues that both he and George testified George grabbed appellant to try to push him toward the car to leave, and the gun accidentally fired at Tamica. However, again, the determination of the facts surrounding the event centered on credibility. The jury apparently chose not to believe either appellant or George. As indicated above, George's entire testimony could have been disbelieved, given his statements to the police conflicted with his trial testimony, and then he later stated he lied to the police. The jury may have also considered George's testimony was tainted by bias, given his testimony that appellant was like a son to him, and he had been married to appellant's mother for 27 years. In addition, neither Tamica nor Bradford testified that George physically touched or moved appellant so as to cause an accidental firing of the gun.
 {¶ 31} The surrounding circumstances further support a finding that appellant knowingly shot Tamica, and his firing of the weapon was not an accident. Appellant had made intimations about shooting Tamica only days before. His and Tamica's relationship was also unstable, with Tamica demanding appellant remove his personal belongings and clothes from the house. Further, appellant had already admittedly shot the gun twice into the air intentionally prior to shooting Tamica. There was also testimony that, when he pulled the gun from the trunk, he stated: "Who wants some?" and "I will kill everybody out here." Thus, that appellant accidentally fired the shot into Tamica's face is dubious, and the jury apparently did not believe such. We have been given no reason to disturb the jury's weighing of the evidence and its credibility determinations. Therefore, the jury's verdict, with regard to the charge of felonious assault was not against the manifest weight of the evidence, and appellant's second assignment of error is overruled.
 {¶ 32} Appellant argues in his third assignment of error that the trial court erred in instructing the jury on the issue of self-defense. Specifically, appellant contends the trial court erred in instructing the jury that a defendant asserting self-defense must establish that the other party was the aggressor, and that to do so adds a fourth element to the defense of self-defense contrary to Robbins, supra. However, we have already found, pursuant to appellant's first assignment of error, that the weight of the evidence does not demonstrate that appellant acted in self-defense, and he failed to demonstrate any of the three elements in Robbins. Thus, the issue raised in this assignment of error is moot. Notwithstanding, this court, as well as others, has before found that a trial court does not err in giving an instruction that includes the precise language to which appellant objects herein. See State v. Wade (June 27, 1996), Franklin App. No. 95APA11-1439; see, also, State v. Cole
(Jan. 22, 1997), Hamilton App. No. C-950900; State v. Gibson
(Jan. 6, 1994), Cuyahoga App. No. 64462. For these reasons, appellant's third assignment of error is moot.
 {¶ 33} Appellant argues in his fourth assignment of error that he erred in imposing a non-minimum prison term for felonious assault and ordering it to be served consecutively to the sentence imposed for murder when the additional findings necessary to impose a greater than minimum sentence and consecutive sentences were not proved to the jury beyond reasonable doubt. In State v. Foster, 109 Ohio St.3d 1,2006-Ohio-856, the Ohio Supreme Court ruled that certain Ohio sentencing laws requiring judicial fact finding prior to the imposition of non-minimum or consecutive sentences are unconstitutional in light of Blakely v. Washington (2004),542 U.S. 296. The Foster court mandated that all cases pending on direct review in which the unconstitutional sentencing provisions were applied be remanded for resentencing. Id., at ¶ 31. Therefore, this argument is with merit, and the matter must be remanded for resentencing.
 {¶ 34} We also note appellant asserts under this assignment of error that Foster effectively raised the maximum penalty from the maximum authorized by the facts established by a plea of guilty or a jury verdict to the statutory maximum, in violation of ex post facto principles. Thus, appellant maintains the trial court was prohibited from imposing a sentence any greater than the minimum sentence, as outlined in R.C. 2929.14(D), on the basis of facts proven to the jury beyond a reasonable doubt. However, appellant did not specifically raise this argument in his fourth assignment of error. Pursuant to App.R. 12(A)(1)(b), this court is required to determine the appeal based upon the assignments of error set forth in the briefs under App.R. 16, and we sustain or overrule only assignments of error and not mere arguments. Notwithstanding, as the trial court has yet to resentence appellant, any argument as to the terms or propriety of his new sentence is premature. For these reasons, appellant's fourth assignment of error is sustained in part and overruled in part, and we remand this case for resentencing consistent withFoster.
 {¶ 35} Accordingly, appellant's first and second assignments of error are overruled, his third assignment of error is moot, and his fourth assignment of error is sustained in part and overruled in part. The judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed with respect to the sentence imposed, and this matter is remanded to that court for resentencing, consistent with this opinion.
Judgment affirmed in part and reversed in part; cause remandedfor resentencing.
Klatt, P.J., and McGrath, J., concur.