OPINION
{¶ 1} Defendant-appellant, Ella B. Vinson, appeals from the judgment of the Franklin County Court of Common Pleas, which found Vinson guilty of felonious assault. For the following reasons, we affirm.
 {¶ 2} On September 20, 2007, the Franklin County Grand Jury indicted Vinson on one count of felonious assault, a second-degree felony, in violation of R.C. 2903.11. *Page 2 
Vinson waived her right to a jury trial, and the case proceeded to a bench trial on February 22, 2008.
 {¶ 3} At trial, Aleta Straight testified on behalf of plaintiff-appellee, the State of Ohio, and stated the following. On September 11, 2007, at about 7:00 p.m., Straight was at her daughter's apartment with her two granddaughters. Debbie Porter, Brenda Knight, and Susie Walden were sitting in front of Porter's apartment, and Straight joined them. Straight's two granddaughters began playing with other children nearby.
 {¶ 4} While the four women sat in front of Porter's apartment, Straight heard Vinson yelling "black apes" at the children, so she went to get her grandchildren. When she returned, she stopped in front of Vinson's apartment and said to Vinson "why are you calling the children black apes, and then she grabbed my arm. She said I don't have to answer to you, you White B. And she grabbed my arm and pulled me to the edge of her porch and proceeded to slash at me and stab me." (Tr. 18.) The entire incident lasted "a matter of seconds. Maybe a minute." (Tr. 22.)
 {¶ 5} Straight had nothing in her hands, and she "had no intentions of going there for an altercation." (Tr. 23.) Vinson slashed Straight's left hand and right arm. Straight did not realize immediately that she had been injured. She was "in shock, disbelief." (Tr. 24.) Straight had never seen Vinson before.
 {¶ 6} Straight "had had a few drinks" that evening. (Tr. 27.) She was drinking bourbon, and she had consumed two drinks within 45 minutes prior to the incident. She was not intoxicated.
 {¶ 7} Walden called 911, and Vinson was transported to the emergency room. She received 15 stitches. *Page 3 
 {¶ 8} On cross-examination, Straight testified that she was not intoxicated at the hospital, but she was "very upset, in pain and in shock." (Tr. 40.) When asked whether she would be surprised to learn that the emergency room doctor said she was intoxicated, Straight stated, "No, because the way I was acting, he might have thought I was." (Tr. 41.) When asked whether she was cursing at the medical staff, Straight stated, "I probably was. You do crazy things in shock." Id. She denied having a drinking problem or a history of drunken altercations. She admitted to having an "OMVI," and to an outstanding warrant for her arrest. Id. In an apparent effort to determine Straight's tolerance for alcohol, the court asked Straight about her drinking that evening. Straight replied, "Sir, I drink all the time." (Tr. 50.)
 {¶ 9} Debbie Porter testified on behalf of the state. Vinson was standing on the front porch and was calling the children names. Vinson pulled Straight onto the porch, making stabbing motions. Straight was "flailing her arms." (Tr. 58.) Porter had never had any problems with Vinson. (Tr. 60.)
 {¶ 10} Porter saw Straight and Knight have one or two drinks that evening. Porter was not drinking, nor was Walden. Porter said that Straight "wasn't weaving and wobbling and falling down and everything else. She wasn't that intoxicated." (Tr. 75.) Porter was taking pain medication at that time, but it did not impair her ability to see or hear what happened.
 {¶ 11} Susie Walden also testified and essentially confirmed the other witnesses' testimony. She said that Vinson was calling the children "black apes and black asses" and that Vinson pulled Straight onto her porch and stabbed her. (Tr. 78.) Walden also testified that she had known Vinson for about nine years and used to *Page 4 
associate with her, but that they had had a "falling out." (Tr. 82.) She said that she had had arguments with Vinson about Vinson "messing with the kids." Id. On the evening in question, she had said "a few choice words" to Vinson. (Tr. 83.) On cross-examination, Walden admitted that the neighborhood children sing a derogatory song about Vinson and that she and Vinson had had other incidents between them.
 {¶ 12} Brenda Knight also testified. She stated that she was directly behind Straight and told Straight not to say anything to Vinson. She said she heard Vinson call the children names, heard Straight's question to Vinson, and heard Vinson's response. She said that Straight did not touch Vinson and did not have anything in her hands. Instead, Vinson "just pulled her on the porch and just started stabbing her." (Tr. 103.)
 {¶ 13} Knight also confirmed that she had been drinking that night and "had had one or two shots" of Canadian Mist. (Tr. 105.) She was not intoxicated, however. She did not think Straight was intoxicated that evening, but described Straight as being "in shock" after the stabbing. (Tr. 106.)
 {¶ 14} On cross-examination, Knight agreed that the complex is in a "high-crime neighborhood" and that many people carry weapons. (Tr. 108.) Contrary to her direct testimony, Knight stated that she had not heard Vinson call the children names that evening, but that one of the children came to the four of them and said that Vinson had called them names. Knight also testified that Vinson stabbed Straight four or five times, and on her arm and head. In response to further examination and the court's questions, Knight said that she had taken pain medication that day, but that it did not interfere with her ability to see things clearly. Finally, Knight stated that Straight had her hands in front of her while Vinson was stabbing her and that Straight was trying to protect herself. *Page 5 
 {¶ 15} Columbus Police Officer Anthony Roberts testified that he responded to a call regarding a stabbing. When he arrived, he observed a woman "bleeding from the arm, hysterical." (Tr. 124.) He recovered the knife from Vinson, who admitted stabbing Straight. He described the knife as "a kitchen knife. More of a paring knife. Brown wooden handle. Maybe two, three-inch blade." (Tr. 126.) Roberts identified exhibits depicting "blood spatter and blood drops" at the scene. (Tr. 128.) The blood was on the sidewalk, leading away from Vinson's porch.
 {¶ 16} Roberts stated that, while being transported, Vinson told her side of the story. She said, "it's okay for them to come to my door and call me names and cuss me out, but when I call them little black apes, everybody gets upset." (Tr. 130.) She said she knew "it was wrong, I shouldn't have done it." Id.
 {¶ 17} Roberts also stated that Straight appeared to be intoxicated. On cross-examination, Roberts confirmed that Vinson had called 911, did not attempt to conceal the knife, and was cooperative.
 {¶ 18} After this testimony, and following admission of the state's exhibits, the state rested. Vinson's counsel then moved for directed verdict under Crim. R. 29. The court denied it without discussion.
 {¶ 19} Vinson testified to the following. She is a college graduate and has performed accounting work. She had no prior criminal record.
 {¶ 20} On September 11, 2007, she arrived home at about 7:00 p.m. She had some gardening to do, "grabbed a little kitchen knife and went outside." (Tr. 143.) She saw the four women gathered and said she knew only three of them. She was on the phone at the time. "The next thing you know, this lady was right in front of me. I was *Page 6 
sitting in my chair. This lady came. As soon as I seen her, I smelled her." (Tr. 145.) Vinson said she stood up and said, "excuse me, ma'am, can I help you?" Id. The woman, whom Vinson identified as Straight, did not respond. Vinson described Straight as "intoxicated" and "reek[ing] of alcohol." Id. "[S]he had saliva coming down the right side of her mouth. She really looked disheveled." Id. Vinson stated the following:
 I put my hand on the door. This lady grabbed me from behind. Like I said, she was bigger. I had a knife and my phone in my left hand, and I'm trying to open my door with the right hand. This lady put her left hand around my left arm. The front of her body was up against the back of my body. As I'm trying to open the door, she's knocking my [hand] from the handle. I couldn't even get in my house.
(Tr. 147.)
 {¶ 21} Vinson said that she "had to do a 360" to get out of Straight's arms. (Tr. 148.) In an effort to get away from Straight, Vinson "tapped her with the knife on her wrist." Id. Even after Vinson went inside, Straight did not move away from the door, so Vinson opened the door and said, "lady, you just been stabbed." (Tr. 148-149.) Vinson said that she felt like she was "being abducted. That's what scared me to death." (Tr. 150.)
 {¶ 22} On cross-examination, Vinson admitted that she did not see Straight with a weapon, Straight did not threaten her, and Straight did not act aggressively toward her. She said, however, that she could not get away from Straight. She did not stab Straight until she tried to get to her door, and Straight stopped her and grabbed her from behind. She denied calling the children names and denied that Straight ever said anything to her. *Page 7 
 {¶ 23} Tamara Harvey testified on Vinson's behalf. Harvey lives in an apartment that allows her to see both Vinson's porch and Porter's apartment. She stated that she observed the four women in front of Porter's apartment that evening. She said "[t]hey had all been drinking all day." (Tr. 178.)
 {¶ 24} Harvey heard Walden say to Vinson that she (Walden) was "going to beat you up, you bald-headed * * * and you be this, you be that, and was cussing her out, you know." (Tr. 180.) Harvey was leaving her apartment and did not see what occurred, but she did see Straight with blood on her. She said that the difficulty between Vinson and Walden had been going on for years. She has never heard Vinson call the neighborhood children names.
 {¶ 25} Rhonda Stonerock also testified on Vinson's behalf. She said that she heard the exchange between Vinson and "the three culprits," but she did not see the altercation between Vinson and Straight. (Tr. 184.)
 {¶ 26} Following this testimony and the admission of exhibits, Vinson rested. Vinson's counsel renewed the Crim. R. 29 motion, which the court denied.
 {¶ 27} At closing, the state argued that Vinson committed felonious assault, first, by knowingly causing an injury to Straight, and second, by causing an injury with a deadly weapon. The state also argued that Vinson failed to prove self-defense.
 {¶ 28} Defense counsel argued that Vinson had proven self-defense. He identified the following three elements in support: (1) Vinson was not at fault in creating the violent situation; (2) Vinson "had an honest belief that she was in imminent danger of death or great bodily harm"; and (3) Vinson "did not violate any duty to retreat or *Page 8 
avoid the danger." (Tr. 201, 204.) Counsel also argued that Vinson did not use excessive force.
 {¶ 29} One week after trial, the court held a hearing at which it announced its decision. In discussing Vinson's claim of self-defense, the court referred to State v. Cassano, 96 Ohio St.3d 94,2002-Ohio-3751, State v. Barnes, 94 Ohio St.3d 21, 2002-Ohio-68, andState v. Williford (1990), 49 Ohio St.3d 247. Relying on the standards set forth in those cases, the court concluded that Vinson had not proven self-defense. The court found Vinson guilty of second-degree felonious assault.
 {¶ 30} On March 13, 2008, Vinson filed a "renewed" Crim. R. 29 motion for acquittal. In it, she asserted that her counsel had inadvertently argued the wrong standard for self-defense. Specifically, Vinson argued that counsel should have relied on the standard for self-defense where non-deadly force is used, rather than the more stringent standard where deadly force is used. Under the non-deadly force standard, Vinson argued, she should be acquitted.
 {¶ 31} On March 14, 2008, the court denied Vinson's motion. Even under a more relaxed standard applicable to circumstances involving non-deadly force, the court concluded, Vinson had not met her burden to prove that she acted in self-defense.
 {¶ 32} Vinson appeals, and she raises the following assignments of error:
 FIRST ASSIGNMENT OF ERROR
 The trial court violated [Vinson's] rights to due process and a fair trial when it entered a judgment of conviction against her, when that finding was against the manifest weight of the evidence. Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution. *Page 9 
 SECOND ASSIGNMENT OF ERROR
 [Vinson's] attorney provided her with the ineffective assistance of counsel and violated her rights to due process and a fair trial. Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.
 {¶ 33} In her first assignment of error, Vinson asserts that her conviction for felonious assault was against the manifest weight of the evidence. We disagree.
 {¶ 34} In determining whether a verdict is against the manifest weight of the evidence, we sit as a "thirteenth juror." State v.Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52. We review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. Id. Additionally, we determine "`whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Id., quotingState v. Martin (1983), 20 Ohio App.3d 172, 175. We reverse a conviction on manifest weight grounds for only the most "`exceptional case in which the evidence weighs heavily against the conviction.'" Thompkins at 387, quoting Martin at 175. Moreover, "`it is inappropriate for a reviewing court to interfere with factual findings of the trier of fact * * * unless the reviewing court finds that a reasonable juror could not find the testimony of the witness to be credible.'" State v. Brown, Franklin App. No. 02AP-11, 2002-Ohio-5345, at ¶ 10, quoting State v. Long (Feb. 6, 1997), Franklin App. No. 96APA04-511.
 {¶ 35} R.C. 2903.11(A)(2) defines "felonious assault" as knowingly causing or attempting to cause physical harm to another by means of a deadly weapon or dangerous ordnance. Straight's testimony, as corroborated by Knight, Walden, and *Page 10 
Porter, supports the court's findings that Vinson's actions were intentional. They all testified that Vinson pulled Straight onto the porch. Vinson herself testified that she stabbed Straight. Although Vinson cut Straight with a kitchen knife, the cut was sufficiently serious as to require emergency treatment and 15 stitches.
 {¶ 36} We acknowledge the testimony concerning Straight's consumption of alcohol that evening, as well as consumption by Knight. We must also consider, however, that Straight testified to a high tolerance for alcohol and to being in shock following the incident. While Knight and Porter testified to some use of pain medication, they both testified that this medication did not impair their ability to observe what happened. As the state argues, "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. Furthermore, a criminal defendant "is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial." State v. Timmons, Franklin App. No. 04AP-840,2005-Ohio-3991, ¶ 10. Rather, "[t]he trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible." Id.
 {¶ 37} Vinson also argues that the weight of the evidence supported her claim for self-defense. In order to prove self-defense against non-deadly force, Vinson had to show (1) that she was not at fault for creating the situation giving rise to the altercation with Straight, (2) that she had reasonable grounds to believe that she was in imminent danger of bodily harm, and (3) that her only means to protect herself from that danger was by the use of force not likely to cause death or great bodily harm. State v. D.H., *Page 11 169 Ohio App.3d 798, 2006-Ohio-6953, ¶ 30; State v. Griffin, Montgomery App. No. 20681, 2005-Ohio-3698, ¶ 18. We agree with the trial court's conclusion that Vinson did not make this showing.
 {¶ 38} First, there was evidence that Vinson created the situation that gave rise to the altercation by calling the children names. Although Vinson denied this accusation, Officer Roberts testified that Vinson admitted that she called the children "little black apes." (Tr. 130.) More importantly, there was testimony from four witnesses that Vinson initiated physical contact with Straight by pulling Straight toward her and up the one step to her porch. While Vinson's witnesses stated that they heard words exchanged between Walden and Vinson, they did not see the altercation between Vinson and Straight and did not support Vinson's testimony that she did not initiate contact with Straight.
 {¶ 39} Second, the evidence does not support a finding that Vinson held an honest belief that she was in imminent danger of bodily harm. Vinson testified that Straight did not have a weapon, did not threaten her, and did not act aggressively toward her. While Vinson stated that she felt she was being abducted and felt threatened, her version of how the stabbing occurred — in the course of her 360-degree turn while being held in Straight's arms — lacks credibility, as does her explanation that she only tapped Straight with the knife to get free. And, her testimony concerning her own actions following the stabbing — once she got free, she opened the door to tell Straight that she had been stabbed — does not suggest that she was in great fear of Straight. *Page 12 
 {¶ 40} Third, Vinson's own testimony supports a finding that she could have used other means to free herself from Straight. Although Vinson described Straight as larger than she, Vinson also described Straight as elderly and having the appearance of a homeless person who was lost. While, if true, the presence of such a person would be unsettling, there is no suggestion that Straight presented a physical danger to Vinson so as to justify Vinson's violent actions.
 {¶ 41} For all these reasons, we conclude that the weight of the evidence supported Vinson's conviction for felonious assault. Accordingly, we overrule her first assignment of error.
 {¶ 42} In her second assignment of error, Vinson argues that her counsel provided ineffective assistance. We disagree.
 {¶ 43} The United States Supreme Court established a two-pronged test for ineffective assistance of counsel. Strickland v. Washington (1984),466 U.S. 668. First, the defendant must show that counsel's performance was outside the range of professionally competent assistance and, therefore, deficient. Id. at 687. Second, the defendant must show that counsel's deficient performance prejudiced the defense and deprived the defendant of a fair trial. Id. A defendant establishes prejudice if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.
 {¶ 44} Vinson's primary argument in this respect is that her counsel should have presented more evidence concerning Straight's intoxication. She infers from her counsel's questioning that the emergency room doctor believed that Straight was *Page 13 
intoxicated and abusive toward the medical staff. This additional evidence, Vinson argues, would have supported her claim of self-defense.
 {¶ 45} Because Straight's medical records were not admitted as evidence, we have no way of determining, on this record, what they contained. Nor can we determine whether counsel contacted medical personnel, including the emergency room doctor, and decided, as a matter of trial strategy, that this testimony would not be helpful to Vinson. We will not second-guess a trial attorney's decisions about whether to call a witness. State v. Treesh, 90 Ohio St.3d 460, 490, 2001-Ohio-4. Nor will we speculate about whether that witness' testimony would have been helpful to a defendant's case. Having no grounds on which to conclude that Vinson's trial counsel was ineffective, we overrule her second assignment of error.
 {¶ 46} In summary, we overrule Vinson's first and second assignments of error. We affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
TYACK and BROGAN, JJ., concur.
BROGAN, J., of the Second Appellate District, sitting by assignment in the Tenth Appellate District. *Page 1