[Cite as *State v. Davis*, 2018-Ohio-58.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 17AP-438 |
| v. | : | (C.P.C. No. 16CR-2436) |
| John T. Davis, III, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on January 9, 2018

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee.

**On brief:** *Yeura R. Venters*, Public Defender, and *John W. Keeling*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

SADLER, J.

{¶ 1} Defendant-appellant, John T. Davis, III, appeals from the judgment entry of the Franklin County Court of Common Pleas finding appellant guilty of involuntary manslaughter. For the following reasons, we affirm the decision of the trial court.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} In May 2016, appellant was indicted on one count of involuntary manslaughter, pursuant to R.C. 2903.04, for causing the death of John D. Dawson as a proximate result of committing or attempting to commit misdemeanor assault. Appellant entered a plea of not guilty and waived his right to trial by jury electing instead for his case to be tried to the judge. Plaintiff-appellee, State of Ohio, called Kevin Stewart, a patrol officer for the Columbus Division of Police, as its first witness.

{¶ 3}   Stewart testified that on March 27, 2016, he responded to a call regarding a male who was "down and out" and unresponsive.  (Tr. at 16.)  When he arrived, medics were performing CPR on a man that appeared to be passed out.  Stewart spoke with individuals in the area to learn what had happened.  The first person Stewart spoke to was a person who identified himself by the name "Mike Davis," who stood about five to ten feet away from the unresponsive man.  (Tr. at 17.)  Stewart later learned Mike Davis was actually appellant.  Appellant told Stewart he did not witness the incident but was one of the first people there, and he saw an individual lying down and advised other people standing around to call police.

{¶ 4}   Appellee called Ellsworth Ragland as an eyewitness to an altercation between appellant and Dawson.  Ragland noted he had recently been sentenced to two and one-half years of prison for three different felonies and had an agreement with appellee that if he testified truthfully in the case against appellant, appellee would recommend to the judge on Ragland's case that he receive judicial release from prison after he served six months in prison.

{¶ 5}   Ragland testified that he knew Dawson from "com[ing] around getting * * * high" and believed Dawson's drug of choice was crack.  (Tr. at 26.)  Ragland was aware of problems between Dawson and appellant, including an incident where Dawson had gone to appellant's daughter's house with a gun.  Appellant told Ragland he had gone to talk with Dawson about that incident.

{¶ 6}   According to Ragland, on March 27, 2016, he was outside with his kids when he saw appellant and Dawson talking, which prompted Ragland to tell his son to go into the house.  Dawson said to Ragland, "Ells, tell him I'm the truth," which Ragland took as Dawson asking for Ragland to vouch for him to appellant.  (Tr. at 30.)  Ragland turned around to both of them and yelled "everything good, man" while trying to watch his son at the same time.  (Tr. at 30.)  At that point, he saw appellant throw one punch at Dawson and Dawson "fall back."  (Tr. at 31.)  He believed the punch landed on Dawson's chin because "that's how I see people get knocked out," but the incident happened so fast that Ragland did not know for sure where the punch landed.  (Tr. at 39.)  He did not see Dawson doing anything prior to appellant's punch and did not see any kind of weapon.  According to Ragland, no one else was outside who could have witnessed the altercation.

{¶ 7}    Ragland testified that after Dawson hit the ground, appellant tried to pour water on Dawson's head, tried to get Dawson up, and stated "don't die on me." (Tr. at 34.) Dawson woke up for a minute, asked for some water, drank some, then passed out again. At that point, "[they] called the squad," and Ragland went back into his house. (Tr. at 36.)

{¶ 8}    On cross-examination, Ragland agreed his agreement with appellee occurred five days prior to Ragland's testimony, his prior record included one additional felony and around fifteen additional misdemeanors, and he did not look forward to going back to prison. Ragland confirmed much of his association with Dawson had to do with smoking crack together. According to Ragland, Dawson was respected in the community, and Ragland had never personally seen Dawson disrespect anybody. He heard about Dawson trying to sell a firearm, an attempt which did not go well. Ragland agreed that saying "I'm the truth" could have different meanings depending on the context and could mean "don't mess with me" depending on "how [that person] come[s] at somebody." (Tr. at 52, 54.) Ragland confirmed he saw appellant throw a punch at the point Ragland said "everything good," and Ragland did not see exactly where the punch landed despite telling police appellant punched Dawson on the chin. (Tr. at 54.)

{¶ 9}    The parties then jointly stipulated to the admission of the Franklin County Coroner's Autopsy Report, admission of the Franklin County Coroner's Toxicology Report, and how the coroner and toxicologist would testify if called. The autopsy report identifies the cause of Dawson's death as "[b]lunt force injuries of the head" and indicates that Dawson was 53-years-old, five-foot, eleven inches tall, and weighed 142 pounds. (Coroner's Report: Findings of Fact and Verdict at 2.) The toxicology report indicates, among other things, cocaine and cocaine metabolites were present in Dawson's body at the time of his death. The parties further stipulated Dawson's medical records from Riverside Methodist Hospital identified Dawson's facial injuries as an acute fracture of the left nasal bone with no other trauma to Dawson's face indicated.

{¶ 10}    Appellant moved for acquittal, pursuant to Crim.R. 29, which the trial court denied. Appellant then testified in his own defense.

{¶ 11}    Appellant testified that, in the several weeks prior to the altercation with Dawson, he had been going back and forth between Columbus and Gary, Indiana, waiting for his house to be finished. During one visit to Columbus, his daughter told him that a

man had come to her house and walked in uninvited.  Appellant did not know the man.  Then a second incident occurred where the same man came to his daughter's house with a gun and knocked on the door, and his daughter told the man to stay away.  Appellant did not know anything more than the man's name so appellant asked around the neighborhood about him.

{¶ 12} On March 27, 2016, appellant went to his daughter's house for Easter.  According to appellant, when he went outside to look for his son, a man approached him from the side.  Appellant testified that at the time he did not know who the man was.  When asked about the man's manner, appellant replied "[h]e was like walking up, like—like he wanted to talk to me, honestly, and the way he was coming towards me."  (Tr. at 82.)  Appellant testified the man was talking loud, yelling and cussing, and was basically "[i]n a rage, like arguing" with a "[v]icious" expression.  (Tr. at 82.)  Appellant then testified:

> A.  * * * So when we got up close we having words and words.  Then he's, like, I ain't trying to do anything to your daughter.  I say I know.  But he was already in a rage.  It was, like, beyond being able to try to talk.
>
> Q.  Okay.  So did he have his fists balled up or anything like that?
>
> A.  So he was, like—he was, like—he was coming in a rage.  And I'm standing there be like—like I said, we having words and words.  It was so intense at the time.  All I know, I didn't know who this person was still, like I said.  And we was arguing and I felt it like dude arguing, like, I ain't touch your daughter.  Then came to me, this is must be the Dawson guy.  Like I said, the time that it was happening it was so—it was like—he was in a rage.  He was—the guy was in a rage.
>
> Q.  Okay.  He was in a rage.  Did he have his fists balled up like he was in a fighting stance or something like that?
>
> A.  If I'd had let him got close enough to, like, before I reacted, if I would have he probably would have hit me.

(Tr. at 83-84.)

{¶ 13} When asked what Dawson said to him, appellant responded that Dawson said "you ain't from around here and stuff like that" but was able to recall everything Dawson said. (Tr. at 85.) Appellant agreed that Dawson was taller than him; appellant stated his own height as five-feet, seven and one-half inches tall. Appellant agreed that at the time, Dawson appeared threatening and testified he did actually feel threatened. Appellant testified that he "just swung" at Dawson once and did not know where he hit him; he learned later that he punched him in the nose. (Tr. at 85.) According to appellant, Ragland was not there during the incident.

{¶ 14} Appellant testified that Dawson fell down from the punch and then got up and went in another direction. After appellant's son told him Dawson was lying in the street, appellant went back outside, asked someone in a car to call an ambulance, and tried to revive him with some water. Ragland came outside at some point during this time. Dawson talked and seemed to be "coming to." (Tr. at 87.)

{¶ 15} Police and an ambulance arrived. Appellant admitted to giving police the incorrect name because he did not want to be "caught up" in the matter and was scared. (Tr. at 89.) Appellant had to take his son to Indiana but came back and turned himself in in late April when his name appeared on the television. Appellant testified that in speaking to police during his initial interview, he might have said he pushed Dawson but he could not remember for sure.

{¶ 16} On cross-examination, when asked whether Dawson appeared to be high, appellant answered "I don't know what was wrong with the guy. * * * I didn't know what he did or if he was high or not." (Tr. at 99.) Appellant further testified:

> A. Like I said, we never was really arguing. The man came at me, he came at me aggressive and then just—I mean, be like he was going to hurt me, you know, and I defended myself.
>
> Q. Okay. I think you said that he would probably hit you, right? That's what your thought was?
>
> A. I don't know what he was going to do. He was coming in a rage.

(Tr. at 102.)

{¶ 17} Appellant rested his case. Appellant renewed his Crim.R. 29 motion, which the trial court again denied.

{¶ 18} On February 8, 2017, the court issued an oral decision finding appellant guilty of involuntary manslaughter. In doing so, the trial court read from jury instructions, stating:

> To establish that he was justified in using force not likely to cause death or great bodily harm, the defendant must prove by the greater weight of the evidence that he was not at fault in creating the situation. I don't think there is any evidence that [appellant] was at fault in creating the situation. Also, had reasonable grounds to believe and an honest belief, even if mistaken, that he was in imminent danger of bodily harm.
>
> Then it's the Court's responsibility to then look at the test of reasonableness.
>
> Says words alone do not justify the use of force. Resort to such force is not justified by use of language, verbal threats or words, no matter how provocative.
>
> The test of reasonableness, in deciding whether the defendant had reasonable grounds to believe and an honest belief that he was in imminent danger of bodily harm, you must put yourself in the position of the defendant with his characteristics, his knowledge or lack of knowledge, and under the circumstances and conditions that surround him at the time. You must consider the conduct of, in this case, Mr. Dawson, and decide whether his acts and words caused [appellant] reasonably and honestly to believe that he was about to receive bodily harm.
>
> All right. So the evidence that the Court evaluated in this case, looking at the testimony of [appellant], [appellant] testified that a person that he did not know approached him; that this person started cursing at him, and I think he used the word was enraged, on several occasions like arguing. Said he was loud. He was asked whether or not Mr. Dawson had balled his fists up, and he said no. But he did testify that he felt threatened so that's when he punched him.
>
> There's no evidence in the record about Mr. Dawson having reached for, grabbed, balled up his fists, pushed, or done

> anything to Mr. Dawson [sic] beyond just cursing at him and talking in a loud voice.
>
> So in evaluating the testimony of [appellant] and whether or not he had a reasonable belief that he was in danger of bodily harm, the Court finds that he has not established self-defense and, therefore, the Court does find him guilty of involuntary manslaughter in this matter.

(Tr. at 121-23.)  After considering a pre-sentencing investigation and holding a sentencing hearing on May 26, 2017, the trial court sentenced appellant to a period of community control for three years under "Intensive Supervision."  (May 31, 2017 Jgmt. Entry at 1.)

{¶ 19} On February 17, 2017, appellant filed a motion, pursuant to Crim.R. 29(C), for judgment of acquittal notwithstanding the verdict and alternatively moved for a new trial pursuant to Crim.R. 33(A)(4).  The court denied the motions on March 28, 2017.

{¶ 20} Appellant filed a timely appeal to this court.

## II.  ASSIGNMENTS OF ERROR

{¶ 21} Appellant presents two assignments of error:

> [1.] THE TRIAL COURT ERRED WHEN IT IMPROPERLY APPLIED THE LAW REGARDING SELF-DEFENSE TO ITS ADJUDICATION OF THE DEFENDANT'S CASE.
>
> [2.] THE DEFENDANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF EVIDENCE SINCE THE PREPONDERANCE OF THE EVIDENCE DEMONSTRATED THAT HE ACTED IN SELF-DEFENSE.

## III.  DISCUSSION

### A.  First Assignment of Error

{¶ 22} Under the first assignment of error, appellant contends the trial court erred by improperly applying the law of self-defense to his case.  For the following reasons, we disagree with appellant.

{¶ 23} We note this case involves a trial to the court.  "[A] trial judge is presumed to know the applicable law and apply it accordingly." *State v. Dear*, 10th Dist. No. 14AP-298, 2014-Ohio-5104, ¶ 11.  However, we apply de novo review to the extent appellant's assignment of error raises questions of law. *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 16, quoting *Castlebrook, Ltd. v. Dayton Properties Ltd. Partnership*, 78

Ohio App.3d 340, 346 (2d Dist.1992) ("De novo review is appropriate 'where a trial court's order is based on an erroneous standard or a misconstruction of the law.' ").

{¶ 24} Self-defense is an affirmative defense, and the burden of going forward with the evidence of self-defense, and the burden of proof for demonstrating self-defense, rests with the accused. *State v. DiFrancesca*, 10th Dist. No. 10AP-340, 2011-Ohio-3087, ¶ 34, citing *State v. Palmer*, 80 Ohio St.3d 543, 563 (1997); R.C. 2901.05(A). Self-defense in Ohio has slightly different requirements depending on whether the defendant used "non-deadly force" or "deadly force." *State v. Juntunen*, 10th Dist. No. 09AP-1108, 2010-Ohio-5625, ¶ 21. "Deadly force" means "any force that carries a substantial risk that it will proximately result in the death of any person" where "force" alone means "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1), (2); *State v. McDowell*, 10th Dist. No. 10AP-509, 2011-Ohio-6815, ¶ 30.

{¶ 25} A single punch with a fist is ordinarily considered use of non-deadly force. *State v. Triplett*, 192 Ohio App.3d 600, 2011-Ohio-816 (8th Dist.) (finding that a jury instruction on self-defense by non-deadly force is required where the defendant threw a single punch resulting in the victim's death); *State v. Mendoza*, 10th Dist. No. 16AP-893, 2017-Ohio-8977, ¶ 91-94 (analyzing defendant's assertion of self-defense under non-deadly force requirements where the defendant landed a single punch hard enough to break his employer's jaw in two places and sever an artery in the back of his neck); *State v. Perez*, 72 Ohio App.3d 468, 470 (10th Dist.1991) (finding the trial court erroneously instructed the jury on self-defense by use of deadly force where the defendant landed a single punch hard enough to require the victim to have surgery to repair "fractures of the tripod bone in the region below the left eye and in the vicinity of the nasal and sinus passages"); *State v. Palmer*, 10th Dist. No. 12AP-460, 2013-Ohio-5970, ¶ 12 (distinguishing use of weapon to hit victim, which requires a jury instruction on use of deadly force, with a single punch as found in *Triplett*); *Struthers v. Williams*, 7th Dist. No. 07 MA 55, 2008-Ohio-6637, ¶ 14-16 (finding defendant used non-deadly force in punching a person three times, causing some bruising).

{¶ 26} "In order to establish self-defense involving non-deadly force, a defendant must prove: '(1) he was not at fault in creating the situation that gave rise to the affray,

(2) he had both reasonable grounds to believe and an honest belief, even if mistaken, that he was in imminent danger of bodily harm, and (3) the only means of protection from that danger was the use of force not likely to cause death or great bodily harm.' " *Mendoza* at ¶ 90, quoting *DiFrancesca* at ¶ 33, citing *State v. McGowan*, 10th Dist. No. 08AP-55, 2008-Ohio-5894, ¶ 26. "Furthermore, '[t]he degree of force permitted depends upon what is reasonably necessary to protect that individual from the imminent use of unlawful force.' " *DiFrancesca* at ¶ 33, quoting *State v. Puckett*, 10th Dist. No. 06AP-330, 2006-Ohio-5696, ¶ 22.

{¶ 27} Appellant's argument to support reversal under this assignment of error concerns the second requirement: that he had both reasonable grounds to believe and an honest belief, even if mistaken, that he was in imminent danger of bodily harm. Specifically, appellant asserts the trial court reached its decision that appellant did not have reasonable grounds to believe he was in imminent danger of bodily harm by improperly concluding (1) "the defendant had failed to prove his [defense] because the words or language of the decedent could not be considered," (2) "the defendant had failed to prove that the decedent had first used unlawful force against him or was immediately attempting to use force against him," and (3) the trial court generally failed to consider the situation in its entirety. (Appellant's Brief at 14.)

{¶ 28} Regarding his first contention, appellant agrees "[i]t has long been established that a person cannot use force against someone because of insulting words or because the other person said something that was merely offensive," and "[a] person is entitled to defend himself only against the immediate use of force against his person." (Appellant's Brief at 16.) Appellant refers to hypotheticals whereby an assailant yells "I'm going to blow you away" or "I'm going to kick your ass" as justification for defending oneself. (Appellant's Brief at 16, 18.) However, appellant has not alleged the actual content of Dawson's words in this case, which contain no such explicit threat of bodily harm, justified his use of self-defense. Rather, appellant primarily contends the trial court here improperly concluded it could not consider Dawson's words at all and "totally ignored [Dawson's actions in yelling and screaming] since they involved words." (Appellant's Brief at 19.)

{¶ 29} This contention falls against the record of this case. In making his determination, the trial court stated, "in deciding whether the defendant had reasonable grounds to believe and an honest belief that he was in imminent danger of bodily harm, * * * [y]ou must consider the conduct of, in this case, Mr. Dawson, and decide whether his acts *and words* caused [appellant] reasonably and honestly to believe that he was about to receive bodily harm." (Emphasis added.) (Tr. at 122.) The trial court went on to expressly consider Dawson's loud, cursing, enraged behavior before determining that appellant did not have a reasonable belief he was in danger of bodily harm. Appellant's argument to the contrary lacks merit.

{¶ 30} Regarding his second contention, appellant asserts the trial court "concluded that a person cannot act in self-defense until his assailant has struck him or is in the process of striking him" and imposed an additional requirement under self-defense law to that effect. (Appellant's Brief at 19.) It is well-established that evidence of a person's specific threatening actions preceding a defendant's alleged use of self-defense is properly considered as a part of determining whether the defendant had reasonable grounds to believe he or she was in imminent danger of bodily harm.[1] *See, e.g., State v. Wagner*, 3d Dist. No. 13-15-18, 2015-Ohio-5183, ¶ 25 (considering whether victim "rush[ed]" the defendant or had clenched fists in determining whether any subjective belief he was in imminent danger of bodily harm held by the defendant was objectively reasonable); *State v. Vinson*, 10th Dist. No. 08AP-381, 2008-Ohio-6430, ¶ 39 (considering victim's actions in concluding evidence did not support a finding that defendant held an honest belief she was in imminent danger of bodily harm).

{¶ 31} In this case, the trial court properly considered the lack of evidence in the record about Dawson having "reached for, grabbed, balled up his fists, pushed, or done anything" else to appellant in the context of its broader evaluation of whether appellant had reasonable grounds to believe he was in imminent danger of bodily harm. (Tr. at 123.) Appellant's assertion that the trial court concluded a person cannot act in self-

---

[1] A person's specific threatening actions preceding a defendant's alleged use of self-defense may also be relevant to the other elements of self-defense, such as the determination of whether or not the defendant was at fault in creating the situation that gave rise to the affray. *See, e.g., DiFrancesca* at ¶ 36-39; *State v. White*, 10th Dist. No. 05AP-1178, 2006-Ohio-4226, ¶ 26-27.

defense until his assailant has struck him or was in the process of striking him or imposed an additional requirement on appellant is against the record and lacks merit.

{¶ 32} Regarding his third contention, appellant asserts the trial court simply failed to consider the situation in its entirety and focused too much on the lack of "an overt act" by Dawson. (Appellant's Brief at 22.) In a bench trial, a trial judge is "presumed to have considered only the competent and material evidence." *State v. Sanders*, 92 Ohio St.3d 245, 267 (2001). A trial court is not required to issue findings of fact in a criminal case tried without a jury. Crim.R. 23(C); *Struthers* at ¶ 24. In this case, the trial court stated that in deciding "whether the defendant had reasonable grounds to believe and an honest belief that he was in imminent danger of bodily harm, you must put yourself in the position of the defendant with his characteristics, his knowledge or lack of knowledge, and *under the circumstances and conditions that surround him at the time*." (Emphasis added.) (Tr. at 122.) Although the trial court did not elaborate at length and in great detail, it did expressly consider appellant's testimony that a person he did not know approached him in an enraged manner and that appellant testified to feeling threatened. The court also considered the lack of record evidence beyond the cursing and loud talking—such as Dawson reaching for, grabbing, or pushing appellant or balling up his fists—in support of appellant's reasonable fear of bodily harm. The record shows the trial court did consider the altercation in its entirety to arrive at its decision that appellant's use of force was not justified as self-defense. As a result, we find appellant's argument to the contrary lacks merit.

{¶ 33} Appellant additionally devotes part of the argument under this assignment of error to Dawson's known status as a drug abuser, Dawson's blood testing positive for cocaine, and a general discussion of the effects of cocaine. According to appellant, "[m]ost people would be alarmed and frightened if confronted by a violent, raging, crack-addled man." (Appellant's Brief at 10.) Appellant adds the fact that appellant was able to punch Dawson in the nose shows that Dawson had invaded appellant's personal space when Dawson engaged in such threatening behavior. These arguments relate to the weight of the evidence in regard to whether appellant possessed an honest and reasonable belief he was in imminent danger of bodily harm. Since these arguments do not support reversal under this assignment of error, we decline to address them. *Huntington Natl. Bank v.*

*Burda*, 10th Dist. No. 08AP-658, 2009-Ohio-1752, ¶ 21, citing App.R. 12(A)(1)(b) (stating that "a court of appeals shall * * * [d]etermine the appeal on its merits on the assignments of error set forth in the briefs") and *Williams v. Barrick*, 10th Dist. No. 08AP-133, 2008-Ohio-4592, ¶ 28 (holding appellate courts "rule[] on assignments of error only, and will not address mere arguments").

{¶ 34} Accordingly, appellant's first assignment of error is overruled.

**B.  Second Assignment of Error**

{¶ 35} Under the second assignment of error, appellant contends his conviction for involuntary manslaughter is against the manifest weight of the evidence.  For the following reasons, we disagree with appellant.

{¶ 36} As a preliminary issue, appellant contends we should apply de novo review to this assignment of error since the trial court determined his guilt under the wrong standard of law.  We have already determined under the first assignment of error that the trial court did not err in this regard and proceed to apply the well-established standard of review for challenges to the manifest weight of the evidence.

{¶ 37} When presented with a manifest-weight challenge, an appellate court may not merely substitute its view for that of the trier of fact but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.  *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).  An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' "  *Thompkins* at 387, quoting Martin at 175.

{¶ 38} In conducting a manifest weight of the evidence review, we may consider the credibility of the witnesses.  *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6.  However, in conducting such review, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' "  *Id.*, quoting *Seasons Coal Co., Inc. v. Cleveland*,

10 Ohio St.3d 77, 80 (1984). "Accordingly, we afford great deference to the jury's determination of witness credibility." *State v. Albert*, 10th Dist. No 14AP-30, 2015-Ohio-249, ¶ 14, citing *State v. Redman*, 10th Dist. No. 10AP-654, 2011-Ohio-1894, ¶ 26, citing *State v. Jennings*, 10th Dist. No. 09AP-70, 2009-Ohio-6840, ¶ 55. "Mere disagreement over the credibility of witnesses is not a sufficient reason to reverse a judgment on manifest weight grounds." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 25, *discretionary appeal not allowed*, 140 Ohio St.3d 1455, 2014-Ohio-4414, citing *State v. G.G.*, 10th Dist. No. 12AP-188, 2012-Ohio-5902, ¶ 7.

{¶ 39} Appellant's argument to support reversal under this assignment of error again concerns only the second requirement of the non-deadly force form of self-defense. Appellant argues he had reasonable grounds to believe he was in imminent danger of bodily harm "when he was aggressively approached by a crack-addled stranger who was yelling and screaming at him with a violent look on his face." (Appellant's Brief at iii.) Appellant points out that Dawson had ingested cocaine, acted in a way consistent with a person high on cocaine, "acted violently," yelled and screamed at appellant, got within an unsafe distance of appellant, placed appellant in fear, and placed Ragland in enough fear to send his son inside. (Appellant's Brief at 24.) To appellant, this evidence clearly justified appellant striking Dawson under the circumstances.

{¶ 40} However, evidence also exists that appellant did not have reasonable grounds to believe he was in imminent danger of bodily harm. Appellant's own testimony about his fear of bodily harm was equivocal and undermined by credibility issues. Although appellant testified he felt threatened by Dawson, a stranger who appellant described as "coming in a rage [at him]," he also testified that he believed Dawson approached him as if he wanted to talk, and the two "ha[d] words and words" prior to the punch. (Tr. at 83, 102.) Appellant believed "[i]f I had let [Dawson] got close enough to, like, before I reacted, if I would have he *probably* would have hit me," but when later asked about that belief, appellant admitted "I don't know what he was going to do." (Emphasis added.) (Tr. at 83-84, 102.) Although appellant now emphasizes the reasonableness of his fear due to Dawson's ingestion of cocaine, appellant did not know Dawson had ingested cocaine at the time of the incident and did not testify that Dawson's possible impairment contributed to his fear of bodily harm. Appellant's claim of self-

defense at trial is further weakened by evidence that he lied about his identity and involvement in the incident to the responding police officer.

{¶ 41} Furthermore, Ragland's testimony showed that Dawson asked Ragland to vouch for him just moments before appellant punched him, which undermines appellant's contention that Dawson was pure rage and aggression in his interaction with appellant. Although Ragland's deal with appellee and prior record call his credibility into question, Ragland's testimony was largely consistent with appellant's version of events, and credibility alone is generally not cause to reverse the judgment on manifest-weight grounds. *Harris.* We note that appellant now cites to Ragland's testimony regarding having his son go inside during the incident in support of his reasonable belief of bodily harm and that such citation is at odds with appellant's testimony that Ragland was not present during the incident.

{¶ 42} After our review of the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, we find the trial court as trier of fact did not clearly lose its way and did not create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins.* Therefore, appellant's conviction is not against the manifest weight of the evidence.

{¶ 43} Accordingly, appellant's second assignment of error is overruled.

## IV. CONCLUSION

{¶ 44} Having overruled appellant's two assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

TYACK and KLATT, JJ., concur.

————————————